## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                         No. 1:19-cr-00768-JCH-1

EPIFANIO MURILLO-GONZALEZ,
*also known as* EPIFANIO GONZALES,

     Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION TO SUPPRESS

This matter is before the Court on Defendant's Motion to Suppress Statements and Tangible Evidence, Def.'s Mot., ECF No. 37. The Government responded in opposition, Govt.'s Resp., ECF No. 39, to which Defendant filed a reply, Def.'s Reply, ECF No. 40. The Court held a hearing on the motion on December 3, 2020. The Court, having carefully considered the motion, briefs, record evidence, and relevant law, concludes that the motion will be **denied**.

## I.    Factual Findings

The Court makes the following findings of fact, as supported by the record, in accordance with Federal Rule of Criminal Procedure 12(d). In making its factual findings, the Court heard the testimony of Jorge Casanova, a deportation officer with the Department of Homeland Security (DHS), whom the Court finds credible. On the morning of February 16, 2019, Officer Casanova went to execute an administrative warrant to arrest a man named Jose Torres-Mena on suspicion that he was illegally present in the United States. *See* December 3, 2020 Motion Hearing Transcript (Tr.) 12:9-21; 13:12-14, ECF No. 54. Casanova and other agents surveilled

Torres-Mena's suspected residence in Albuquerque. *Id*. at 15:22-23. As they covertly watched, a pick-up trucked driven by Defendant arrived at the house. *Id*. at 18:14-15; 20:18. A few minutes later, Torres-Mena exited the house, climbed into the truck's passenger side, and Defendant and Torres-Mena drove off. *Id*. at 18:14-19.

After driving a few blocks, Casanova and three other officers stopped the truck to serve the warrant on Torres-Mena. *Id*. at 20:13-15; 37:20. While two officers dealt with detaining Torres-Mena, Officer Casanova spoke with Defendant while the fourth officer stood nearby. *Id*. at 20:15-18, 21:7-8; 25:14-22; 37:21 – 38:1-5. Casanova explained in English the purpose of the stop. *Id*. at 21:16 – 22:1-3. Defendant did not understand him, so Casanova switched to Spanish and asked Defendant to step out of the truck and move to the sidewalk, which he did, and to produce driving documents. *Id*. at 22:5-23:12.

Defendant handed over a New Mexico driver's license and a Mexican consular identification. *Id*. at 23:12-14. Casanova then asked Defendant where he was from. *Id*. at 24:7-8. Defendant answered that he was from Mexico. *Id*. at 24:8-9. Casanova then asked him if he had any authority to be in the county, to which Defendant answered no. *Id*. at 24:9-11.[1] Casanova

---

[1] On cross-examination, Casanova described the sequence of these events in a different order:

> I asked him where he was from. He told me he was from Mexico and I asked him if he had any documents he was like yes and he provided them to me. And then I asked him if he had any valid authorization to work inside the United States, which he told me no, I do not, I am illegal.

Tr. at 39:1-6.

Under this telling of events, Casanova arguably lacked reasonable suspicion to question Defendant about his immigration status. However, as explained *infra*, the questioning was ultimately permissible – without regard to reasonable suspicion – because it occurred during the scope of the lawful traffic stop.

also asked Defendant if he had committed any crimes while in the United States, to which he answered that he had committed a drug offense. *Id*. at 44:17-20.

Casanova then ran the identification documents through police records. *Id*. at 24:19; 45:9-14. Within a couple of minutes, the records revealed that Defendant was previously deported for a drug crime and unlawfully in the country. *Id*. at 24:19-25; 26:23-24. Casanova then told Defendant that he was under arrest and placed him in handcuffs. *Id*. at 28:9; 55:2-5. The time between the initial stop and the arrest was three to four minutes. *Id*. at 27:19 – 28:1. Casanova told Defendant to remain silent but did not otherwise provide him *Miranda* warnings. *Id*. at 28:13-16. He told Defendant that he would "fully *Mirandize*" him later at a DHS office. *Id*. at 28:14.

Meanwhile, other officers had completed a search of Torres-Mena that involved searching him for contraband, "getting [his] property ready," and asking Torres-Mena about any medical issues that officers needed to be aware of. *Id*. 55:8-23. At the time that Casanova determined he would arrest Defendant, other officers had either placed Torres-Mena in a police car or were about to do so. *Id*. at 55:9-17. The time from Defendant's departure from Torres-Mena's house to when both he and Torres-Mena were handcuffed and placed in a police vehicle occurred within five to eight minutes. *Id*. at 56:3-6.

Once at the DHS office, Casanova took Defendant's fingerprints and entered them into the IDENT and IAFIS computerized system. *Id*. 32:1-9. This search showed that Defendant had an "A-File" and "history" with DHS. *Id*. at 31:9-18; 32:1-18. According to Defendant's motion, a final order for Defendant's removal was issued in 1990 and Defendant had not reapplied for admission into the country since his removal. Def.'s Mot. at 4. Officers *Mirandized* Defendant

for the first time and he gave incriminating answers to questions about his history of immigration violations. Tr. at 29:10 – 30:15.

Defendant was federally charged by criminal complaint and later indicted for reentering the United States despite being a removed alien in violation of 8 U.S.C. §§ 1326(a), (b). In December 2019, Defendant moved to suppress evidence of his alienage, including his oral and written statements to officers and the contents of his Alien File (A-File), claiming that this evidence was obtained in violation of the Fourth and Fifth Amendments.

## II.   Legal Standards

### a. Criminal and Immigration Detentions and Arrests

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. In general, law enforcement officers must obtain a warrant supported by probable cause before conducting a search or seizure. *Kentucky v. King*, 563 U.S. 452, 459 (2011). "Although 'the defendant bears the burden of proving whether and when the Fourth Amendment was implicated,' … '[t]he government then bears the burden of proving that its warrantless actions were justified [by an exception],'" *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020) (quoting *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017)). "If the government establishes that an exception to the warrant requirement applies, the search is constitutional." *Neugin*, 958 F.3d at 930 (citing *United States v. Maestas*, 2 F.3d 1485, 1491-92 (10th Cir. 1993)). Even though Defendant is not a United States citizen, the relevant Fourth Amendment rights apply to him. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896).

In the immigration context, immigration officers are authorized by statute "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Accompanying regulations authorize an immigration officer to "briefly

detain [a] person for questioning" if the "immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned ... is an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2). "The officer can arrest a suspect without a warrant if the officer has 'reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest.'" *United States v. Sanchez-Velasco*, 956 F.3d 576, 581 (8th Cir. 2020) (quoting 8 U.S.C. § 1357(a)(2)).

"'Reason to believe'" means probable cause that the Fourth Amendment requires for a valid arrest." *Id*. Simply stated, "immigration officers [must] have reasonable suspicion to briefly stop individuals to question them regarding their immigration status and probable cause for any further arrest and detention." *Morales v. Chadbourne*, 793 F.3d 208, 215 (1st Cir. 2015); *Medina v. U.S. Dep't of Homeland Sec.*, No. C17-218-RSM-JPD, 2017 WL 2954719, at *21 (W.D. Wash. Mar. 14, 2017), *report and recommendation adopted*, No. C17-218 RSM, 2017 WL 1101370 (W.D. Wash. Mar. 24, 2017) ("The lawfulness of an ICE officer's seizure of a non-citizen turns on the familiar principles of reasonable suspicion and probable cause: If an officer detains a person for a brief, investigatory stop, the stop must be supported by reasonable suspicion that the person is an alien illegally in the United States … and if an officer arrests a person, the arrest must be supported by probable cause that the person is an alien illegally in the United States.") (quotation marks and citations omitted).

**b. *Miranda* Safeguards Under the Fifth Amendment**

The Fifth Amendment guarantees that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V. *Miranda v. Arizona*, 384 U.S. 436 (1966) established certain safeguards that must be afforded to suspects, including the right to remain silent and to have counsel present during a custodial interrogation. Under *Miranda,* "the

government may not use any statements stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Any waiver of one's Fifth Amendment under *Miranda* must be made voluntarily, knowingly, and intelligently. *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008). "The Fifth Amendment protection afforded by the *Miranda* rule applies to citizens and aliens alike." *United States v. Jimenez-Robles*, 98 F. Supp. 3d 906, 911 (E.D. Mich. 2015) (citing *Mathews v. Diaz,* 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.")).

## III.    Discussion

### a. Fourth Amendment Analysis

### 1. The traffic stop was justified at its inception

Defendant argues that by pulling him over to serve the warrant on his passenger, officers used the initial traffic stop as a pretext to seize Defendant even though officers lacked probable cause or any reasonable, articulable suspicion that Defendant was engaged in wrongdoing. "A traffic stop, even if brief and for a limited purpose, constitutes a 'seizure' under the Fourth Amendment and is subject to review for reasonableness." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020) (citing *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). A traffic stop is analogous to a "*Terry* stop" under *Terry v. Ohio*, 392 U.S. 1 (1968). *See Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609 (2015). "To be reasonable, a traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself." *Mayville*, 955 F.3d at 829 (quoting *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017)); *United States v. Windom*, 863 F.3d 1322, 1328 (10th Cir. 2017) ("When evaluating the reasonableness of a traffic stop under *Terry*,

we engage in a two-part inquiry—asking, first, whether the stop was justified at its inception, and second, whether the officers' actions [were] reasonably related in scope to the circumstances which justified the interference in the first place.") (citations and internal quotation marks omitted) (alteration in original).[2]

Here, officers had a warrant for Torres-Mena's arrest and watched him enter Defendant's truck. They could stop the truck to serve the warrant even though Defendant was not the subject of the warrant and officers lacked suspicion of wrongdoing by Defendant. *See United States v. O'Connor*, 658 F.2d 688, 691 (9th Cir. 1981) ("It is obvious that in executing the warrant, the agents could stop the vehicle in which they reasonably thought [the defendant] was a passenger."); *United States v. Savath*, 398 F. App'x 237, 239 (9th Cir. 2010) ("Officers may stop a vehicle in which they reasonably believe the subject of a warrant is traveling to execute the warrant."); *United States v. Helton*, 232 Fed. App'x. 747, 749 (10th Cir. 2007) (upholding traffic stop made for the purpose of executing an arrest warrant on vehicle's passenger). Officers therefore permissibly stopped the vehicle to serve the warrant, even though Defendant was not the subject of that warrant.

### 2. The officers' actions were tied to the traffic stop

ICE officers' actions, though justified at their inception, must still be reasonably related in scope to the circumstances which justified the initial interference. *See Windom*, 863 F.3d at 1328. "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope," the latter of which "must be strictly tied to and

---

[2] The Government argues that officers searched the truck under the automobile exception to the warrant requirement because Defendant's vehicle "held evidence of a crime, in the form of Mr. Torres-Mena himself." Govt.'s Resp. at 8. *See Carroll v. United States*, 267 U.S. 132, 158-59 (creating automobile exception). But the Government cited no authority that a human body can be evidence of a crime in these circumstances, so the Court does not address its automobile exception argument.

justified by the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 18-19 (citations and internal quotation marks omitted). Even if the police have reasonable suspicion to make a traffic stop, that detention is "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). "Officers may not prolong a stop beyond that point for the purpose of detecting evidence of ordinary criminal wrongdoing unless separate reasonable suspicion exists to justify further investigation." *Mayville*, 955 F.3d at 829 (citing *Rodriguez* 575 U.S. at 354-55, 135 S.Ct. at 1609).

"[T]he tolerable duration of police inquiries ... is determined by the seizure's mission[.]'" *Rodriguez*, 575 U.S. 354, 135 S.Ct. 1614. The mission of a traffic stop is "to address the traffic violation that warranted the stop ... and attend to related safety concerns[.]" *Id.* The stop may "last no longer than is necessary" to complete its mission. *Id*. (quoting *Royer*, 460 U.S. at 500). "Ordinary inquiries incident to [the traffic] stop," *Id.* at 575 U.S. 355, 135 S. Ct. 1615, include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* These inquiries ensure "that vehicles on the road are operated safely and responsibly." *Id.*

Defendant first argues that Casanova "had no business asking [Defendant] for his" identification documents because he was not a traffic violation suspect. Def.'s Reply at 3. However, an officer is entitled to ask a vehicle's driver and passenger about their identities. *See United States v. Cortez*, 965 F.3d 827, 838 (10th Cir. 2020); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007) ("The police may ask people who have legitimately been stopped for identification without conducting a Fourth Amendment search or seizure.") (citing *INS v. Delgado,* 466 U.S. 210, 216 (1984)).

Defendant next argues that the arrest of Torres-Mena terminated the traffic stop and thus the questioning which occurred afterwards was an unlawful expansion of the traffic stop's scope. Defendant cited no authority addressing whether checking the immigration status of an individual during a traffic stop to execute a warrant falls within the "mission of the stop," and thus the Court lacks guidance on the issue.

But even assuming that immigration-status inquiries are unrelated to a traffic stop's mission, the rule is that even unrelated inquiries by officers are permitted so long as they do not add time to the stop. *See Rodriguez* at 575 U.S. 354–55, 135 S. Ct. 1614–15. "For instance, police *during the course of a traffic stop* may question a vehicle's occupants on topics unrelated to the traffic infraction." *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)) (emphases in original). Or officers may perform a dog sniff around the outside of a vehicle, "as long as the police do not extend an otherwise-completed traffic stop in order to conduct these unrelated investigations." *Id*. (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)). But "[a]n officer's authority to seize the occupants of a vehicle ends when 'tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *Cortez*, 965 F.3d at 833 (quoting *Rodriguez* at 575 U.S. 354, 135 S.Ct. 1609).

The Supreme Court's decision in *Muehler v. Mena*, 544 U.S. 93 (2005) illustrates these principles in the context of immigration-status inquires during a detention. In *Mena*, the police entered Iris Mena's house to execute a valid search warrant for deadly weapons and evidence of gang membership. A federal immigration officer accompanied police during the search. The immigration officer questioned Mena about her immigration status while the search warrant was being executed, even though he lacked reasonable suspicion to do so. She brought a 42 U.S.C. § 1983 action, contending that the officer's questioning constituted a separate seizure. The Ninth

Circuit affirmed the district court's judgment in Mena's favor and held that the immigration-status questioning constituted a seizure and that "particularized reasonable suspicion … of inquiry into citizenship status," was required. *Id*. at 101, n.3.

The Supreme Court reversed. Because Mena was going to be detained for several hours while the search warrant was executed, questioning into her immigration status was permissible since it occurred within the confines of her lawful detention. "[M]ere police questioning does not constitute a seizure," the Court explained. *Id*. at 101. Thus, after *Mena*, "questioning—on any subject—cannot violate the *scope* prong of *Terry*." *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010). Immigration-related inquiries thus are permissible "where the initial seizure of the individual is lawful and the questioning does not prolong the seizure." *Yoc-Us v. Attorney Gen. United States*, 932 F.3d 98, 105 (3d Cir. 2019). What officers may not do is "stop an individual only to inquire about their immigration status," or "extend a stop for such an inquiry." *Id*. Although *Mena* was not a traffic stop case, courts have "extended its holding to the traffic-stop context." *Everett*, 601 F.3d at 490.

Here, the evidence shows that the traffic stop was ongoing and had not come to its logical conclusion when Casanova asked Defendant for documents and inquired about his immigration status. "Normally, [a traffic] stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Johnson,* 555 U.S. at 333. Casanova's testimony indicated that the traffic stop concluded when Defendant and Torres-Mena were placed in a police vehicle, which occurred roughly five to eight minutes after the two men left Torres-Mena's house. Several things happened during the interim which showed that the stop was ongoing. First, Casanova had lawfully asked for Defendant's documents during this period. Again, an officer is entitled to ascertain the identity of a lawfully detained vehicle's driver and

passenger as part of a *Terry* stop. *Cortez*, 965 F.3d at 838. This necessarily includes the time needed to complete a record check of an individual, which in this case took "a couple of minutes." Tr. at 26:23-24. Second, while Casanova spoke to Defendant, other officers were executing arrest procedures on Torres-Mena, such as searching his person, taking into custody his effects, and asking him about any medical issues. Casanova's immigration-related inquiry was thus reasonable because the questioning occurred during the duration of the lawful traffic stop. *See Johnson*, 555 U.S. at 333; *United States v. Aispuro-Medina*, 256 F. App'x 215, 217, 219 (10th Cir. 2007) (state trooper's questioning of the defendant about whether he had a "green card" and was "an illegal alien" did "not implicate the Fourth Amendment" because the questioning did not add time to the traffic stop).

Defendant claims that the Supreme Court's decision in *United States v. Brignoni–Ponce,* 422 U.S. 873 (1975) prohibited Casanova "from stopping or detaining persons for questioning about their citizenship unless there is reasonable suspicion." Tr. 60:13-15. However, the *Mena* Court explained that in *Brignoni-Ponce* the Court considered "only whether … [roving border] patrols had the authority to *stop* automobiles in areas near the Mexican border, … and expressed no opinion as to the appropriateness of questioning when an individual was already seized." *Mena*, 544 U.S. at n.3 (emphasis in original). *Brignoni-Ponce* never "create[d] a requirement of particularized reasonable suspicion for purposes of inquiry into citizenship status." *Id*. Here, Defendant was already lawfully seized. Casanova was thus permitted to question him, even on matters unrelated to the purpose of the detention, because such questioning did not add time to the stop. *See id.* at 101; *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006).

**3. The arrest was lawful**

"An alien present in this country who was inadmissible when he entered is deportable." *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) (citing 8 U.S.C. § 1227(a)(1)(A) & (B)). "A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime." *Id*. (quoting *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1038 (1984)). "An alien may be arrested and detained pending a decision whether he is to be removed "[o]n a warrant issued by the Attorney General." *Id*. (quoting 8 U.S.C. § 1226(a)). Immigration employees and officers are given "powers without warrant" to "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). Accompanying regulations provide that the following "standards for enforcement activities" concerning immigration arrests.

> (c)(2)(i) An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested … is an alien illegally in the United States.

> (ii) A warrant of arrest shall be obtained except when the designated immigration officer has reason to believe that the person is likely to escape before a warrant can be obtained.

8 C.F.R. § 287.8(c)(2)(i)-(ii). As noted earlier, courts interpret "reason to believe" as equivalent to probable under the Fourth Amendment. *Sanchez-Velasco*, 956 F.3d at 581. "An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *United States v. Munoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008) (quoting *United States v. Brooks,* 438 F.3d 1231, 1241 (10th Cir. 2006)).

Based on Defendant's admission that he was in the country unlawfully and the record check confirming that admission, Casanova had reason to believe that Defendant was an alien subject to deportation. Casanova also had reason to believe that Defendant was likely to escape before a warrant could be obtained given that Defendant was stopped in a vehicle. *See Quintana*, 623 F.3d at 1241 (officer had reason to believe that immigrant detained during a traffic stop was a flight risk). Although Defendant was not behind the wheel during the encounter, Casanova testified that there was always the possibility that Defendant might attempt to flee and that a foot chase could ensue. *See* Tr. 25:14-22. The Court defers to the officer's on-the-scene judgments and concludes that Casanova had probable cause to make a warrantless arrest for deportation proceedings under 8 U.S.C. § 1357(a)(2).

**b. Fifth Amendment Analysis**

**1. Defendant was not in custody during the roadside questioning**

Defendant next argues that Casanova's roadside questioning of Defendant about his immigration status required prior *Miranda* warnings. "[T]wo requirements must be met before *Miranda* is applicable: the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993); *United States v. Benard*, 680 F.3d 1206, 1211 (10th Cir. 2012) ("It is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question. Instead, *Miranda* only applies when an individual is subject to custodial interrogation.") (citation omitted). As the Tenth Circuit has explained,

> [w]hether a person is in custody for *Miranda* purposes depends on the type of the encounter with police. Of the three types of police-citizen encounters—voluntary cooperation, an investigatory detention under *Terry v. Ohio*, … and a formal arrest—*Miranda*'s custody element is triggered only in situations associated with formal arrests. In other words, "a defendant is not in custody under either of the first two encounters and therefore *Miranda* warnings need not usually be given."

13

*United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (quoting *United States v. Griffin,* 7 F.3d 1512, 1516 (10th Cir. 1993)).

A person is "in custody" when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest. *See Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). The relevant inquiry for determining whether an individual is "in custody" is whether a reasonable person in that position would "believe her freedom of action had been curtailed to a 'degree associated with formal arrest.'" *Griffin*, 7 F.3d at 1518 (quoting *Beheler*, 463 U.S. at 1125); *Berkemer v. McCarty,* 468 U.S. 420, 440 (1984)). This is an objective inquiry that considers the totality of the circumstances. *Cortez*, 965 F.3d at 840 (citation omitted).

The questioning that occurs during a routine traffic stop generally requires no *Miranda* warnings because these everyday police-motorist encounters are brief, non-threatening, and conducted in the presence of others. *See Berkemer* 468 U.S. at 437-8. However, "[l]aw enforcement officials may create the custodial interrogation that *Miranda* contemplates 'by employing an amount of force that reache[s] the boundary line between a permissible *Terry* stop and an unconstitutional arrest.'" *United States v. Curls*, 219 F. App'x 746, 754 (10th Cir. 2007) (quoting *Perdue*, 8 F.3d 1459)). As the *Berkemer* Court explained, "if a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." 468 U.S. at 440.

The test for determining whether a roadside traffic stop amounts to a custodial interrogation subject to *Miranda* is whether the "traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to

14

require that he be warned of his constitutional rights." *Id.* at 437. The Tenth Circuit has avoided "hard line rules," *Griffin*, 7 F.3d at 1518, to determine whether a suspect is in custody. The following considerations guide the court's analysis: First, "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *Id.* Second, "the nature of questioning," where "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Id.* Third, the court uses "the following helpful guideposts" to "check whether police dominate the encounter," *Jones*, 523 F.3d at 1240, namely:

> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id.*

Defendant's motion did cite these factors and he provided virtually no analysis of them. The record does, though, contain some facts which could support a finding that Defendant was in custody. First, Defendant was not told he was free to terminate the encounter. This is important because "the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention." *Griffin,* 7 F.3d at 1518. Second, for *Miranda* purposes, asking Defendant about his immigration status was arguably unrelated to a traffic stop for executing a warrant on Defendant's passenger. Courts addressing similar circumstances have held that "asking a detainee questions unrelated to the stop is evidence of a custodial interrogation." *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 882 (S.D. Ohio 2016) (holding that ICE officer's immigration-status questioning placed defendant in custody in part because the questioning was unrelated to the traffic stop for driving with the wrong license plate) (quotation marks and citation omitted). Third, the traffic stop

resulted in Defendant's arrest at the conclusion of the question. *See id*. at 883 (noting that a suspect's arrest at the conclusion of lengthy questioning is a consideration in the custody analysis).

However, even with these facts leaning in Defendant's favor, the totality of the circumstances suggest that he was not in custody. The questioning occurred during daylight hours, on a public neighborhood road, and the questioning was "extremely brief." *United States v. Sanchez-Gallegos*, 412 F. App'x 58, 65 (10th Cir. 2011). There is no evidence that Casanova's tone was threatening, that he used or mentioned physical restraints or a firearm, or that he denied Defendant access to his vehicle. *Cf. Jimenez-Robles*, 98 F. Supp. 3d at 917 (immigrant was in custody where "the agents had handcuffed him and deprived him of access to his car and drove it to another location, where they maintained custody over the car while it was searched, a canine unit was summoned, and a canine sniff was conducted."); *Pacheco-Alvarez*, 227 F. Supp. 3d at 882 (officers placed immigrant in custody by "remov[ing] [him] from the van and den[ying] him access to it while the sheriff's deputies conducted a canine sweep … and then a full vehicle search."). And "[w]hile an interview that ends in arrest may indicate a custodial setting, that is not dispositive, especially when the interview arises from reasonable suspicion and the suspect's answers provide probable cause for the arrest." *Sanchez-Velasco*, 956 F.3d at 581 (citation omitted).

Defendant's detention therefore resembled the sort of "police citizen encounter envisioned by the Court in *Terry*" which "usually involves no more than a very brief detention without aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is substantially less police dominated than that surrounding [formal arrest]." *Cortez*, 965 F.3d at 841 (citation omitted) (alteration in original).

Considering the totality of circumstances, Defendant was not in custody when Casanova questioned him about his immigration status.

Finally, the Court notes that "physical evidence uncovered by ICE officers" such as a defendant's "fingerprints and A-file … cannot be suppressed under the Fifth Amendment regardless of whether any officer improperly failed to give … a *Miranda* warning." *United States v. Arrazola-Vanega*, No. 14-CR-00435-RBJ, 2015 WL 3562168, at *4 (D. Colo. May 21, 2015). "In contrast to the Fourth Amendment context, the exclusionary rule or 'fruit of the poisonous tree doctrine' does not apply to mere failures to give *Miranda* warnings.... This is because the *Miranda* rule protects against violations of the Self–Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *Id*. (quoting *United States v. Lara–Garcia,* 478 F.3d 1231, 1235–36 (10th Cir. 2007)). In *Lara-Garcia*, the defendant told an ICE agent that he was an illegal immigrant in response to unwarned questioning. *Id*. at 1233. ICE agents then ran his fingerprints and discovered that he was previously deported. *Id*. The Tenth Circuit held that "[e]ven *assuming* … the agent's question violated Defendant's Fifth Amendment right, the physical evidence which arose from such violation, *i.e.,* Defendant's fingerprints and immigration file, is not suppressible." *Id*. at 1235 (emphasis in original). Thus, any physical evidence such as an A-File that allegedly arose from Casanova's failure to administer a *Miranda* warning is not suppressible.

### 2. Questioning at the ICE station

Defendant says that officers' subsequent recitation of *Miranda* warnings at the ICE facility did not "cure the initial violation," *i.e.*, the unwarned, roadside questioning. Def.'s Mot. at 9. Defendant cites *Missouri v. Seibert*, 542 U.S. 600, 607 (2004), in which the Supreme Court analyzed the admissibility of a second confession given after a pre-*Miranda* statement. *Seibert*

17

"comes into play when police purposefully withhold *Miranda* warnings while interrogating a suspect in custody in order to obtain a full confession and then provide him with full warnings and get him to re-confess—the so-called 'two-step' or 'question first' strategy." *United States v. Douglas*, 688 F. App'x 658, 663 (11th Cir. 2017) (italics added). As evidence that Officer Casanova uses a forbidden two-step interrogation technique, Defendant pointed to Casanova's testimony from a 2019 preliminary hearing in which he testified that his "typical way of encountering" a suspect is to "question them, … get them to admit the allegation[,] … do further investigation and then … read them their rights." Tr. 37:2-7.

There is no need to analyze Defendant's *Seibert* arguments because he was not in custody during the roadside questioning. *See United States v. Courtney*, 463 F.3d 333, 336 (5th Cir. 2006) ("*Seibert* only applies if the first statements were obtained in violation of *Miranda.*"); *United States v. Moore*, 670 F.3d 222, 229 (2d Cir. 2012) (stating that if a defendant's initial statement was not obtained in violation of *Miranda*, "there is no need to go further" in the suppression analysis). The Court therefore proceeds no further in the *Seibert* analysis.

**IT IS THEREFORE ORDERED that** Defendant's Motion to Suppress Statements and Tangible Evidence **(ECF No. 37)** is **DENIED**.

**IT IS SO ORDERED**.

HONORABLE JUDITH C. HERRERA
Senior United States District Judge